**In re MIDWAY AIRLINES, INC., Midway Airlines (1987), Inc., and Midway Aircraft Engineering, Inc., Debtors.**

**ALLIED BUILDING PRODUCTS CORP., as assignee, Plaintiff,**

v.

**MIDWAY AIRLINES, INC., Continental and Unknown Owners and Non–Record Claimants, Defendants.**

**Nos. 93 C 4135, 92 A 1290.**

United States District Court, N.D. Illinois, E.D.

Dec. 16, 1993.

Floyd Babbitt, Glen Keysor, John Delnero, Fagel & Haber, Chicago, IL, for plaintiff.

Sheldon L. Solow, Chapter 7 Trustee.

Richard G. Smolev, Marc Kieselstein, Sachnoff & Weaver, Ltd., James A. Stempel, James H.M. Sprayregen, Kirkland & Ellis, Chicago, IL, for defendants.

## MEMORANDUM AND ORDER

MORAN, Chief Judge.

This is an action brought by Allied Building Products Corporation (Allied), successor in interest to Single Ply Systems, Inc. (Single Ply), against Continental Bank and the estate of Midway Airlines and related entities (Midway). Allied is attempting to recover approximately $187,000 now being held in escrow. This action is before the court in the form of an appeal because Allied's motion for summary judgment to recover the escrowed amount was denied by the bankruptcy court. For the reasons stated below, the court affirms the bankruptcy court's decision and denies Allied's motion for summary judgment.

## FACTS

On March 25, 1991, Midway petitioned for reorganization under Chapter 11 of the Bankruptcy Code. On September 6, 1991, Midway filed a motion to approve assumption of real property leases with the City of Chicago (Hangar motion) (Rec.Supp. Vol. 2, § 1).

The motion sought bankruptcy court approval for the assumption of Midway's real property leases with the City, including the 1991 amended and restated lease of Hangar facilities (Hangar 2 lease).[1] *See* 11 U.S.C. § 365. On September 25, 1991, Midway filed an emergency motion to approve the sale/leaseback of Midway's leasehold interests at Chicago Midway Airport (Gates motion) (Rec. Supp. Vol. 2, § 5). This motion sought approval of Northwest Airlines' purchase from Midway of its leasehold interest in 21 gates and related facilities at Chicago Midway Airport for $20 million, and the lease of those interests back to Midway. *See* 11 U.S.C. § 365.

Single Ply responded to the Hangar motion on October 4, 1991, requesting that the motion be denied unless Midway provided for payment of Single Ply's mechanics' lien claim (Rec.Supp.Vol. 2, § 7). Single Ply's claim against Midway resulted from Midway's failure to fully compensate Single Ply for work it completed on Hangar 2. According to Single Ply, this lien created a default under the Hangar 2 lease, which Midway could only cure by making payment in full. Single Ply argued that Midway had to cure the default or adequately assure it would be cured in the future before the bankruptcy court could approve Midway's assumption of its Hangar 2 lease with the City. *See* 11 U.S.C. § 365(b)(1).

On October 8, 1991, the bankruptcy court held a hearing to discuss the Hangar motion and the Gates motion (Rec.Supp.Vol. 2, § 19). Midway cited Single Ply's assertion of a lien and its objection to "the transfer of assets." *Id.* at 44–45. Midway informed the court that "in order to transfer the assets required, we'll set up an escrow for [$187,000], and at a later date, address the propriety of the lien." *Id.* at 45.

On the same day, October 8, 1991, the bankruptcy court issued an order and judgment, as well as findings of fact and conclusions of law in support of its judgment (Rec. Supp.Vol. 2, §§ 8–9). The October 8 order

warrants special attention because it forms the basis for Allied's appeal. Paragraph 4 authorized Midway to assume and convey

> the Midway Leasehold and Assets to Northwest, free and clear of all liens, claims and encumbrances, and Northwest shall acquire the Midway Leasehold and Assets ... free and clear of all liens, claims and encumbrances. Any asserted liens, claims and encumbrances shall attach to the proceeds of the sale. Without limiting the foregoing, the Debtors shall establish a segregated escrow account in the amount of $187,000 to secure the lien claim of Single Ply Systems, Inc. from the proceeds of sale, which shall be held subject to further order of court.

(Rec.Supp.Vol. 2, §. 9 at 4.) The bankruptcy court subsequently issued an amended order and judgment on October 10, 1991, which authorized Midway

> to assume that certain Lease of Hangar Facilities at Midway Airport, as amended and restated by that certain *1991 Amended and Restated Lease of Hangar Facilities* dated as of September 1, 1991 between Midway and the City of Chicago, for that certain real estate at Chicago Midway Airport commonly known as "Hangar 2" [emphasis included].

(Rec.Supp.Vol. 2, § 10.)

The transaction between Midway and Northwest was to occur in two phases. The transaction's initial phase was completed when Midway sold its interest in gates and passenger terminals to Northwest for $20 million. However, negotiations with Northwest for the second phase collapsed and Midway was unable to sell its remaining assets. Consequently, on November 27, 1991, the bankruptcy court converted Midway's Chapter 11 proceeding to a Chapter 7 case.

On January 23, 1992, Single Ply filed a motion to direct payment (motion for payment) requesting payment from the escrow established in the October 8, 1991 order (Rec.Supp.Vol. 2, § 12). The motion for payment was addressed at a hearing on January

---

1. There is some disagreement as to the contents of the lease, but the dispute does not affect this decision. Nor is this decision concerned with the other real property leases between Midway and the City, the Airport Use Agreement and Terminal Facilities Lease, and the Hangar Facilities Lease (Hangar 1 Lease).

23, 1992 (Rec.Supp.Vol. 2, § 17). It came to light that no escrow had been created and that the estate did not have sufficient funds to pay Single Ply. *Id.* at 17–19. Continental Bank agreed to create the escrow with $187,000 of the money it received from Northwest,[2] and the bankruptcy court directed the bank to so do in its order of January 27, 1992 (Rec.Supp.Vol. 2, § 13). That same order also directed Single Ply to notify interested parties of the opportunity to object to Single Ply's motion for payment. *Id.*

Continental Bank and the trustee filed objections to Single Ply's motion for payment (Rec.Supp.Vol. 2, §§ 14–5). On February 13, 1992, the bankruptcy court held a hearing on the motion (Rec.Supp.Vol. 2, § 18). The court concluded that an adversary proceeding was necessary to determine the validity, priority, or extent of other parties' claims to the escrowed amount. *Id.* at 25. Therefore, it denied Single Ply's motion for payment (Rec.Supp.Vol. 2, § 16).

On September 23, 1992, Allied filed an adversary proceeding against the trustee and Continental Bank for the funds held in escrow. The bank filed its answer on October 13, 1992, and the trustee filed his answer on January 13, 1993, after his motion to dismiss was denied. On February 16, 1993, Allied filed a motion for summary judgment. Allied argued that when the October 8, 1991 and January 27, 1992 orders established an escrow, they created a trust, and that Single Ply's lien attached to the escrow as security for the lien. The trustee responded that Single Ply's lien claim did not extend to the escrowed amount because it did not attach to the collateral which yielded proceeds to fund the escrow. On June 17, 1993, the bankruptcy court denied Allied's motion for summary judgment. 1993 WL 243935 (Bankr.N.D.Ill.).

In its June 17, 1993 order the bankruptcy court found that Allied possessed a valid mechanics' lien claim against Midway's leasehold interest in Hangar 2. 1993 WL 243935, at *6. However, the bankruptcy court also held that the lien did not attach to the escrow because the escrow was not funded from the

sale of property upon which Single Ply had a lien. *Id.* at *8. Single Ply's claim was against Midway's interest in Hangar 2, which ultimately was not transferred to Northwest, and did not yield proceeds. *Id.*

The bankruptcy court understood the sequence of events as follows. At the time of the October 8, 1991 hearing, Midway suggested that an escrow be used until Single Ply's claim could be investigated. *Id.* at *7. Midway did not discuss either the possibility that the escrow would be substitute collateral for Single Ply's claim, or that Single Ply would have a replacement lien in the escrowed funds in lieu of its claim. *Id.* Furthermore, the bankruptcy court found that

> neither the October 8th nor the January 27th Orders granted Single Ply any replacement lien in the escrowed funds or made any finding that the claimed lien was established or substituted. The October 8th Order merely established the escrow pending the sale closing to secure the lien claim from the sale proceeds of [Midway's interest in Hangar 2]. Unfortunately for Single Ply and its assignee, Allied, the sale of Hangar No. 2 did not close and no sale proceeds therefrom were received . . .

*Id.*

## DISCUSSION

 This court sits as an appellate tribunal when reviewing a bankruptcy court's decision. *Matter of Evanston Motor Co., Inc.*, 735 F.2d 1029, 1030–31 (7th Cir.1984). The court therefore accepts findings of fact, unless they are clearly erroneous, but reviews legal conclusions *de novo*. *Matter of UNR Industries, Inc.*, 986 F.2d 207, 208 (7th Cir.1993). If a court construes or interprets its own orders it will not be reversed "unless it constitutes a clear abuse of discretion." *Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1203 (7th Cir.1989), *citing United States v. Bd. of Educ. of City of Chicago*, 717 F.2d 378, 382 (7th Cir.1983). *See also S.E.C. v. HerMil, Inc.*, 838 F.2d 1151, 1152 (11th Cir.1998). "Few persons are in a better position to understand the meaning" of an

---

2. However, the bankruptcy court pointed out, and the bank agreed, that using $187,000 of the bank's money to create the escrow would increase the estate's debt to the bank by that amount (Rec.Supp.Vol. 2, § 17 at 19).

order than the "judge who oversaw and approved it." *Graefenhain*, 870 F.2d at 1203. Therefore, a court's interpretation of its own order is entitled to deference. *Id.* *See also Home Port Rentals, Inc. v. Ruben*, 957 F.2d 126, 131 (4th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 70, 121 L.Ed.2d 36 (1992).

In *Home Port*, the disputed order provided that a suit could be reinstituted " 'no later than 180 days from the date of this Order.' " 957 F.2d at 131. The question was whether "the date of this Order" referred to the date it was signed or the date it became effective, and the district court interpreted its own order to mean no later than 180 days from the date the order became effective. *Id.* The Fourth Circuit observed that "[i]t is peculiarly within the province of the district court ... to determine the meaning of its own order," and affirmed the district court's interpretation because there was no abuse of discretion. *Id.*

In *HerMil*, two provisions of a district court's order were at issue. 838 F.2d at 1153. One paragraph provided that "where a defendant is owed money by the trustee, the defendant having complied with all orders herein imposed, will receive cash." *Id.* Another referred to the "respective defendants." *Id.* Five years after entering the order containing these provisions, the district court held that one of the defendants was not to be treated individually, but instead would only receive cash upon certain action being taken by another defendant. *Id.* at 1152–53. The Eleventh Circuit reversed the district court's construction of its previous order, reasoning that the district court was not "merely interpreting its original order" because there was no ambiguity in that order. *Id.* at 1154.

Unlike the disputed order in *HerMil*, which clearly referred to the defendants individually, the language of the bankruptcy court's October 8, 1991 order was ambiguous. After the bankruptcy court made initial mention of the Hangar motion in the introduction to its October 8, 1991 order, it did not identify that motion or the Hangar 2 lease again as the subjects of its decision. Moreover, the primary concern of the paragraph in which the bankruptcy court created the escrow was actually Midway's Gates motion, not the Hangar motion or the Hangar 2 lease. The language in the October 8, 1991 order thus was ambiguous regarding the source of funds for payment of Single Ply's claim. A further source of ambiguity was the fact that the October 8, 1991 order, while creating the escrow, failed to grant Midway's Hangar motion, which was the reason for the escrow. This contributed to the need for the October 10, 1991 order, which specifically granted Hangar motion. Consequently, this case is analogous to *Home Port*, which concerned the ambiguous language "from the date of this Order," 957 F.2d at 131, and is distinguishable from the unambiguous order in *HerMil*, 838 F.2d at 1153.

The confusion underlying the October 8, 1991 order came to the surface at the January 23, 1992 hearing. At that hearing the bankruptcy court, Continental Bank and the trustee discussed the Hangar 2 lease in the context of the two phases of the transaction between Midway and Northwest. The parties were unclear as to the distinction between the transaction's two phases, the purpose of the compensation already paid by Northwest, and whether Midway assumed or assigned the Hangar 2 lease.[3] It is therefore

---

**3.** The following is an excerpt from the January 23 hearing:

> [The Bank]: As I understand it, and maybe I'm confused about the transaction but this was a lease that was being assumed and assigned to Northwest. Is that correct?
> [The Trustee]: That's correct.
> The Court: But Northwest paid the agreed consideration. It's just some of the proceeds that were supposed to be escrowed for whatever reason weren't, thus, we have [Allied] wanting its money as the beneficiary, though it was supposed to be an escrowed trust fund that for

whatever reason just didn't get separately earmarked.
> [The Bank]: That's right. But ... [w]e've been talking about that lease being rejected right now. If it was assigned to Northwest, there's nothing to reject. That's what I don't understand.
> The Court: I don't either ...
> [The Trustee]: ... Northwest may have taken the obligation to have the hangar assigned to it, but it has never asserted those rights ...
> [The Bank]: ... The issue seemed to have been raised at the time of the hearing by Single Ply whether this was a default that needed to be

not surprising that there was ongoing uncertainty regarding the source of funds for payment of Single Ply's claim.

Significantly, the parties fully admitted their uncertainty surrounding the lien and made several qualifying statements concerning its resolution. At the October 8, 1991 hearing, Midway agreed to create an escrow, but cautioned that "at a later date" it would "address the propriety of the lien" (Rec. Supp.Vol. 2, § 19 at 45). In the October 8, 1991 order, the bankruptcy court instructed Midway to establish an escrow "which shall be held subject to further order of court" (Rec.Supp.Vol. 2, § 9 at 4; *see also* January 27 Order). And finally, when Continental Bank agreed to create an escrow in lieu of the one Midway was instructed to establish but did not, the bankruptcy court observed that the bank's action would increase the "debt that's still owing and unpaid out of the estate to that tenant" (Rec.Supp.Vol. 2, § 17 at 19). In other words, the ultimate source of any payment for the lien had never been determined.

In light of this court's conclusion that the October 8, 1991 order was ambiguous regarding Single Ply's mechanic's lien claim and the creation of an escrow, the court finds that the bankruptcy court's June 17, 1993 order constitutes its interpretation of that ambiguity. *But cf. HerMil,* 838 F.2d at 1154. The bankruptcy court, as author of the October 8, 1991 order, is in the best position to understand its meaning. *Graefenhain,* 870 F.2d at 1203. Therefore, the bankruptcy court's interpretation is entitled to deference and will be reversed only if it constitutes an abuse of discretion. *Id. See also Home Port,* 957 F.2d at 131.

In its June 17, 1993 order, the bankruptcy court provided a reasonable interpretation of its October 8, 1991 order. Just as in *Home Port* it was reasonable for the court to interpret "from the date of this Order" to mean from the date the order became effective, 957 F.2d at 131, the bankruptcy court's interpre-

tation of its October 8, 1991 order was reasonable. The bankruptcy court did not abuse its discretion when, based on the language and circumstances of the October 8, 1991 order, it concluded

> the October 8th Order made no reference to the escrow constituting a substitute pool of funds that would be, in all events, available to satisfy Single Ply's lien claim. The terms of the October 8th Order did not grant Single Ply a lien on a different source of collateral in exchange for [Midway's] right to assume the Hangar No. 2 lease. The Court finds that the proceeds of the escrow were not intended by the Court to be paid to Single Ply unless it first proved a valid lien claim upon the subject property it improved, Hangar No. 2, and such property was sold ... The subject proceeds that were escrowed were not the result of a sale of property on which Single Ply had a valid lien claim. The October 8th Order merely provided a mechanism for Single Ply to secure its unproven lien claim into a fund in which to trace the proceeds of the sale of the property, subject to its lien, in the event it was sold.

1993 WL 243935, at *8. The possibility of alternative understandings of the October 8, 1991 order, based upon any ambiguity, does not render the bankruptcy court's interpretation unreasonable. Moreover, this court is most convinced by the bankruptcy court's interpretation of the October 8, 1991 order.

Allied argues that regardless of what the trustee and bankruptcy court now say was meant by the October 8, 1991 order, it is superseded by the reasonable meaning of the language "to secure the lien claim of Single Ply Systems," which created either a replacement lien or substitute collateral. *See Lucy v. Zehmer,* 196 Va. 493, 84 S.E.2d 516 (1954). However, as previously indicated, this court defers to the bankruptcy court's June 17, 1993 order, which provides a reasonable in-

---

cured under the lease in order for the lease to be assumed and assigned. The Court did not decide that at the time, simply established the escrow and left that issue for another day, and that day has not yet come. So if that escrow should be established, fine, but since we ha-

ven't resolved the substantive legal issue of whether that money should be paid, at most what should be done is the escrow should be established ...

(Rec.Supp.Vol. 2, § 17 at 19–22.)

terpretation of the October 8, 1991 order different from Allied's. Additionally, due to the ongoing uncertainty surrounding Single Ply's lien and the escrow's creation, the court is not convinced that it was reasonable for Allied to conclude that the language "to secure the lien claim of Single Ply Systems" created either a replacement lien or substitute collateral.

As support for its understanding of the October 8, 1991 order, Allied contends that Single Ply withdrew its objection to Midway's assumption of the Hangar 2 lease in exchange for the escrow's creation.[4] If this court affirms the June 17, 1993 order, Allied argues, it will have nothing to show for Single Ply's withdrawal of its objection. However, this court is not convinced that Allied's situation today would be any different had Single Ply asserted its objection at the October 8, 1991 hearing. Any resolution of Single Ply's objection would most likely have been affected by subsequent developments. Single Ply had a lien claim against Midway's interest in Hangar 2, but that interest ultimately did not yield proceeds because it was not sold to Northwest. *See* 1993 WL 243935, at *7. Therefore, it is highly unlikely that Allied would have recovered the amount of the lien even if Single Ply had asserted its objection. Consequently, this court is not convinced that the bankruptcy court's June 17, 1993 order deprives Allied of any benefits of a bargain that it contends Single Ply reached with Midway.

## CONCLUSION

In summary, this court affirms the bankruptcy court's June 17, 1993 order and denies Allied's motion for summary judgment.

---

4. As stated by Single Ply at the January 23 hearing: "We work out this arrangement with [Midway], and we could have prevented—I don't know what the Court would have done—we could have stood up here and prevented this entire transaction from going forward unless this was resolved ..." (Rec.Supp.Vol. 2, § 17 at 22.)