**In re CXM, INC. d/b/a Chicago Extruded Metals Company, an Illinois corporation, Debtor.**

**In re Precision Metal Components, LLC, a Delaware limited liability company, Debtor.**

**In re CXM Ottawa, LLC, an Illinois corporation, Debtor.**

**Nos. 03 B 28236, 03 B 28257, 03 B 28268.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

April 1, 2004.

Gesas, Pilati, Gesas and Golin, Ltd., for Plaintiff.

Shaw, Gussis, Fishman, Glantz, Wolfson & Towin, for Defendant.

Dannen, Crane, Heyman, Simon; United States Trustee; Much Shelist, Freed, Denenberg, Ament & Rubenstein, trustee.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW ON AMENDED MOTION OF BARICIDE FOR ALLOWANCE AND PAYMENT OF BREAK–UP FEE, AND OBJECTION BY SAMIR FINANCIAL

JACK B. SCHMETTERER, Bankruptcy Judge.

The instant contested proceeding relates to the Chapter 11 bankruptcy case filed by Debtor CXM, Inc. ("CXM" or "Debtor"). Its business assets were marketed for sale. Baricide, Inc. ("Baricide") made an offer conditional on being paid up to $200,000 in actual expenses incurred by it in order to evaluate the sale assets should some other bidder overbid Baricide at the auction sale ("overbid protection"). Because Baricide thereby created a market for the sale, that condition was approved. The auction was spirited. An overbidder acquired the assets through the auction, paying $1,126,000 more than Baricide had initially offered.

Samir was a creditor secured by a junior lien on the sale proceeds. It had originally objected to the sale, but in light of the large bid and stated belief of its counsel that enough had been bid to allow for payment on its lien, that objection was withdrawn and the sale was then approved. That sale closed. The sale order provided that all liens on the property sold would attach to the sale proceeds. It also provided that $200,000 was to be set aside in a debtor-in-possession account to cover

the maximum amount that could be allowed to Samir for overbid protection, and that sum was placed in such an account. The first lien secured by the property sold was paid for out of sale proceeds. However, unforeseen events and costs reduced the net proceeds of sale to $200,000.

Baricide now seeks the maximum $200,000 overbid fee, claiming that it was reserved that sum from the sale proceeds. Samir objects to part of the $200,000 claimed, but more importantly objects to any part being paid to Baricide because Samir's uncontested lien attached to the sale proceeds and primes the Baricide claim.

At trial evidence was taken by testimony as to the portion of $200,000 being objected to, and the parties filed a Joint Stipulation of Facts which was admitted into evidence along with many exhibits.

Based thereon, the Court now makes and enters the following Findings of Fact and Conclusions of Law. Pursuant thereto, separate judgment is entered allowing the Baricide $200,000 claim in full as an administrative claim, but sustaining the Samir objection to any payment to Baricide, overruling the Baricide Amended Motion for payment, and ordering the payment of all remaining net sale proceeds to Samir.

### FINDINGS OF FACT

#### The Baricide Offer

1. On July 3, 2003, CXM, Inc., Precision Metal Components, LLC, and CXM Ottawa, LLC, debtors and debtors in possession (the "Debtors"), filed voluntary petitions for relief under chapter 11, title 11, United States Code. An order of joint administration was entered with respect to the Debtors' bankruptcy cases. From the Petition Date to December 9, 2003, the Debtors operated their businesses and managed their affairs as debtors in posses-

sion pursuant to 11 U.S.C. §§ 1107 and 1108. Effective as of December 9, 2003, an order was entered converting the Debtors' Chapter 11 cases to cases under Chapter 7 of the Bankruptcy Code.

2. Immediately prior to the commencement of these Chapter 11 cases, the Debtors, as seller, and Baricide, as purchaser, executed an Asset Purchase Agreement (the "Baricide Offer") providing for the sale and purchase of substantially all of the Debtors' assets (the "Purchased Assets").

3. As of the commencement of these cases, LaSalle Business Credit LLC ("LaSalle") held a first lien on the Purchased Assets and Samir Financial II, LLC ("Samir") held a second lien on the Purchased Assets. An order was entered October 21, 2003, allowing the secured claim of Samir as filed in the amount of $1,000,000 plus interest and costs.

4. The purchase price under the Baricide Offer consisted of $5,914,000 cash, to be adjusted at closing for changes in inventory and accounts receivable, plus payment of up to $340,000 for monies borrowed through debtor in possession financing for specified items.

5. The Baricide Offer was subject to approval of this Court.

6. The Baricide Offer required, *inter alia*, that the Debtors file a motion seeking the entry of an order, in form and substance satisfactory to Baricide, approving the sale procedures. The Baricide Offer set forth certain terms to be included in the sale procedures order, including but not limited to:

(viii) *Overbid Fee.* Notwithstanding anything to the contrary contained in this Agreement, if Purchaser does not submit the Successful Bid at the Auction for reasons other than Purchaser's default under the terms of this Agreement, Seller shall pay to Purchaser the sum of

$200,000 ("Overbid Fee"), at closing of the sale to the successful bidder out of the proceeds of such sale as compensation for the time, resources and costs committed or incurred by Purchaser in its efforts to purchase the Purchased Assets.

### *The Sale Procedures Motion and Order*

7(a). On July 10, 2003, the Debtors filed a motion for authority to sell substantially all of their operating assets outside of the ordinary course of business ("Sale Motion"). The Sale Motion requested authority to sell the Sale Assets free and clear of liens, with "the liens and claims of any entity claiming an interest in the Assets [to] attach to the sales proceeds with the same validity and priority as exist under state law pursuant to Section 363(e) of the Bankruptcy Code." *See* Sale Motion, p. 11 at ¶ 28.

(b). The Sale Assets were to be sold subject to senior priority liens in favor of LaSalle Business Credit LLC ("LaSalle") and junior priority liens in favor of Samir. *See* Sale Motion at ¶¶ 7–9.

(c). The Sale Motion contemplated the sale of the Sale Assets to Baricide pursuant to a certain Asset Purchase Agreement ("Baricide Agreement") that the Debtors and Baricide had executed prior to the Petition Date. *See* Sale Motion, p. 3 at ¶ 13. The Debtors' obligations under the Baricide Agreement were expressly conditioned upon this court's approval after competitive bidding through an auction process. *See* Sale Motion, p. 3 at ¶ 13; Ex. A, pp. 20–22, 23 at ¶¶ 5.13 and 6.2.

8. The Sale Motion was initially presented to this Court on July 17, 2003 and was continued for further hearing to July 22, 2003.

9. On July 24, 2003, this Court entered an Order Establishing Sale Procedures, Approving Form of Sale Notice, and Setting Sale and Hearing Dates (the "Sale Procedures Order").

10. The Sale Procedures Order approved certain Bidding Procedures. The Sale Procedures Order provided, in part: 2. The procedures (collectively, the "Bidding Procedures") described in the Sale Motion for selling the Assets (as defined in the Sale Motion) and the procedures for competitive bidding at the Auction (as hereinafter defined) annexed to this Order as Exhibit 1 are approved in all respects. Without limiting the foregoing, the Debtors are specifically authorized to . . .; and (c) approving the overbid fee requested by Purchaser in an amount equal to Purchaser's actual expenses up to $200,000, if the Purchaser fails to submit the Successful Bid at the Auction not due to the Purchaser's default.

11. Among the Bidding Procedures approved by the Court was the following: *K. Overbid Fee.* If Purchaser [Baricide] does not submit the Successful Bid at the Auction for reasons other than Purchaser's default, the Debtors shall pay the Purchaser an amount equal to Purchaser's *actual expenses up to $200,000 at the Closing of the Sale out of the proceeds of said Sale as compensation for the time, resources and costs committed or incurred by Purchaser in its efforts to purchase the Purchased Assets.* (Emphasis supplied.)

### *Auction/Sale Hearing*

12. On September 2, 2003, Samir filed an objection to the Sale Motion. Samir objected to the proposed sale of its collateral free and clear of its junior lien "unless (a) after all competing bids are submitted, Samir consents to the sale pursuant to 11 U.S.C. § 363(f)(2), or (b) the final bid produces sufficient value to pay Samir's Jun-

ior Lien Claim in full as required by § 363(f)(3)." *See* Samir Sale Objection at p. 1 (footnote omitted).

### The Auction And The Entry Of The Sale Order

13(a). On September 22, 2003, the Debtors conducted an auction of the Sale Assets in open court. *See* Transcript of September 22, 2003 hearing on Sale Motion ("9–22 Tr."). Baricide and CXM Acquisition, Inc. ("Acquisition") were the only bidders at the auction. *See id.*

(b). After an exchange of competitive bids from the two bidders, Acquisition submitted the last and highest bid for the Sale Assets. *See id.* The Court then closed the bidding, and entertained the Debtors' request to approve the high bid from Acquisition. *See id.*

14. The amount of the Successful Bid submitted by CXM Acquisition, LLC exceeded the amount of Baricide's offer by $1,126,000.

15. The Sale Hearing took place immediately following the Auction.

16. In response to this court's inquiry whether any objections to the Acquisition bid existed, Samir's attorneys advised the court that Samir was prepared to withdraw its Sale Objection based upon the Debtors' projection that the Acquisition bid would generate significant net sale proceeds toward the partial satisfaction of Samir's junior secured claim. *See id.* Specifically, Samir's attorney explained as follows:

MR. TOWBIN: Your Honor, we had filed an objection to the sale. But based upon the bidding that has taken place today, and I understand now that the adjustments to the contract will make the purchase price to be approximately $7,840,000, I also understand there will be a $200,000 potential liability for the break-up fee,

leaving a net to the estate of $7,640,000. I also understand from Mr. Welch that the current bank debt without some additional fees from Mr. Solow's client [, LaSalle,] for today and on a go-forward basis is approximately $7 million, leaving a balance above the bank debt and above the DIP liabilities of about $640,000. I assume there will be some slippage in that, and I assume there will be some fees paid. So we expect there will be approximately $600,000 available for Samir Financial as the second lienholder.

*See* 9–22 Tr. at pp. 34–35.

17. Hearing on the Sale Motion was then recessed for two days in order for Debtors to circulate a draft form of order approving the sale to Acquisition. *See* 9–22 Tr. at pp. 38–39. Because Baricide did not prevail at the auction, the Debtors abandoned their efforts for approval of the Baricide Agreement, and the conditions precedent to the Debtors' obligations under the Baricide Agreement remained unsatisfied. *See* Sale Motion, p. 3 at ¶ 13; Ex. A, pp. 20–22, 23 at ¶ 5.13 and 6.12. On September 24, 2003, hearing on the Sale Motion was reconvened and concluded by entry of sale order approving the Debtors' newly executed asset purchase agreement with Acquisition ("Sale Order"). *See* September 24, 2003 Transcript of Sale Hearing ("9–24 Tr.").

18. At the September 24, 2003 hearing, Samir's counsel again expressed its understanding that the Acquisition sale would generate a significant dividend to Samir on account of its secured claim after the satisfaction of LaSalle's senior secured claim:

THE COURT: All right. So there will be a half a mil left?

MR. TOWBIN: That's what we anticipate, Your Honor.

*See* 9–24 Tr. at p. 15. After identification by counsel of potential variables to Samir's dividend from the net proceeds based upon the exact amount of the LaSalle secured claim, the record made clear that counsel for Samir and the Debtors believed that the Acquisition sale would generate between $250,000 to $450,000 in net proceeds payable to Samir:

> THE COURT: Well, a quarter million, more or less, is—will be left.
>
> MR. CASEY: Right.
>
> MR. NEWMAN: Yes.
>
> MR. TOWBIN: Actually, your Honor, I think before—when I gave you the number of 7.3 of the bank's claim, I think I misspoke.
>
> THE COURT: Yes, sir?
>
> MR. TOWBIN: Because yesterday Mr. Welch—or Monday Mr. Welch told me that it was about $7 million as opposed to 7.3.
>
> MR. DANN: The bank thought—the bank had their number on Monday at a little over 7.2. We had it at roughly 7 million, almost even. Basically have to sit down and—
>
> THE COURT: All right. $250 to $450,000.
>
> MR. TOWBIN: Right.
>
> THE COURT: That's the range of what's going to be left over when the dust settles. And your debt is a million.
>
> MR. TOWBIN: Correct, judge.

*See* 9–24 Tr. at p. 17.

### *The Sale Order*

19. On September 24, 2003, an Order was entered Approving Sale of Assets Outside Ordinary Course of Business (the "Sale Order"). That Order confirmed that Samir's lien on the sale assets would attach to the net proceeds of sale. *See* 9–24 Tr. at p. 22. It stated that "[a]ny Interests that encumber or purport to encumber the Purchased Assets shall be transferred to and attach to the proceeds of the sale of the Purchased Assets to the same extent and with the same force, validity, status and effect, if any, as they had against the Purchased Assets." *See* Sale Order, p. 5 at ¶ E:

> D. Leave is granted to Samir to withdraw its objections to the Sale and said objections are hereby withdrawn;
>
> E. The Sale of Purchased Assets (as that term is defined in the Acquisition Agreement) to Acquisition pursuant to the terms and conditions of the attached Acquisition Agreement, except that the purchase price is increased to $7,040,000.00 plus or minus the adjustments set forth in paragraph 3.1 of the Acquisition Agreement, is approved. Pursuant to 11 U.S.C. Sections 363(b) and (f), the Debtors are authorized and directed to consummate the transactions contemplated under the Acquisition Agreement and to sell, transfer, and convey to Acquisition the Purchased Assets, free and clear of all liens, ... *Any Interests that encumber or purport to encumber the Purchased Assets shall be transferred to and attach to the proceeds of the sale of the Purchased Assets to the same extent and with the same force, validity, status and effect, if any, as they had against the Purchased Assets.* (Emphasis supplied.)

●●●

> Z. Baricide shall file the appropriate motion with this Court, with proper notice to all parties in interest, seeking the allowance and payment of its break-up fee; within 28 days hereof.

•••

20. After further discussion of specific terms of the Sale Order and minor revisions thereto, this court entered the Sale Order. *See* 9–24 Tr. at pp. 25–41. The Sale Order provided for three specific payments to be made by the Debtors from the sale proceeds:

    T. The Debtors shall pay all customary closing costs and accrued and unpaid real estate taxes from the proceeds of Sale at closing;

    U. The Debtors shall pay cure costs under the Assumed Contracts and Leases (as that term is defined in the Acquisition Agreement) as separately ordered from the proceeds of Sale at closing;

    V. The Debtors shall pay the claim of LaSalle from the proceeds of Sale at closing subject to the rights of the Unsecured Creditors Committee to seek to invalidate, subordinate or otherwise challenge the Debtors' obligation to LaSalle and LaSalle's prepetition liens;

Sale Order at p. 9, ¶¶ T–V. Except as expressly stated in those three paragraphs of the Sale Order, the Sale Order provided that "any and all distributions of the proceeds of Sale shall be made pursuant to the further Order of this Court." See Sale Order, p. 9 at ¶ S.

21. The Sale Order provided for the remaining proceeds of the sale to be deposited into two accounts established "in Debtor's name." Specifically, the Sale Order provided as follows:

    W. Debtors' Counsel shall deposit the proceeds of the Sale remaining after the payments required in paragraphs T, U, V and X of this Order into an interest-bearing account (Account A) at LaSalle National Bank (in Debtor's name) pending further Order of this Court;

    X. Notwithstanding anything in this Order to the contrary, sufficient sums from the proceeds of Sale (representing cure costs to be paid at the closing of the sale and $200,000 reserved for break-up fees) shall be deposited into the Account B established by Debtors [sic] counsel in Debtor's name.

*See* Sale Order, p. 9 at ¶¶ W–X.

22. Except for the return of Baricide's earnest money deposit, the Sale Order did not authorize any payments to Baricide. *See* Sale Order, p. 9 at ¶ Y. It provided only that "Baricide shall file the appropriate motion with this Court, with proper notice to all parties in interest, seeking the allowance and payment of its break-up fee, within 28 days hereof." *See* Sale Order, p. 10 at ¶ 2.

### *The Sale Closing*

23. On September 30, 2003, the sale of the Purchased Assets closed. The Purchased Assets were sold to Berkshire Investments LLC, ("Berkshire"), as assignee of CXM Acquisition, LLC. The purchase price was $7,726,056.00.

24(a). Pursuant to the Sale Order, the Debtors' counsel deposited $258,160.46 of the sale proceeds (the "Funds") into an account titled "Crane Heyman Simon Welch & Clar Special Account for the Benefit of CXM, Inc."

(b). All of the remaining sale proceeds were used to pay closing costs, real estate taxes and the secured claim of LaSalle. The Debtors' payment to LaSalle satisfied its secured claim in full.

(c). Shortly after closing, pursuant to Court order, $58,160.46 of the Funds were used to pay cure costs for leases and contracts assumed by the Debtors and assigned to Berkshire, leaving $200,000 in the aforesaid account holding the last of the sale proceeds funds.

25. Samir has received no proceeds from the Sale Assets. The total amount of Samir's allowed secured claim remains unpaid

### Baricide's Request For Payment of Break Up Fee

26. Baricide has moved for payment of a break up fee in the amount of $200,000 (the "Break Up Fee Motion"), based on the Sales Procedure Order. It asserts that it incurred actual expenses in excess of $200,000 in connection with its efforts to purchase the Purchased Assets. A summary of these expenses is set forth below:

| Payee | Purpose | Amount |
|---|---|---|
| Accord Enterprises, Inc. | Recruiter—interviews | $ 2,200.00 |
| Accurate Background | Background checks | $ 2,862.50 |
| Air Planning, LLC | Air fare for due diligence trip to two other brass extruders | $ 6,737.00 |
| Amber Aguilar | Employee expenses for local travel etc. | $ 131.84 |
| Aronberg Goldgehn Davis & Garmisa | Corporate counsel | $ 22,146.04 |
| Dennis J. Burda | Security | $ 600.00 |
| Executive Protection Security Service, Ltd. | Security | $ 7,650.00 |
| Edward R. Kirby & Associates, Inc. | Background checks | $ 2,209.90 |
| Glenn Haeflinger | Employee expenses for local travel etc. | $ 2,536.17 |
| Gesas, Pilati, Gesas and Golin, Ltd. | Bankruptcy counsel | $ 72,849.90 |
| Illinois Development Finance Authority | IRB application fee | $ 1,500.00 |
| Internection | Employment advertising | $ 5,723.78 |
| Laura Golembieski | Employee expenses for local travel etc. | $ 195.07 |
| The Martin Law Firm | Environmental counsel | $ 4,476.71 |
| Mercury Management, Inc. | Environmental consultant | $ 3,357.40 |
| Neal, Gerber & Eisenberg, LLP | Labor counsel | $ 13,001.34 |
| NexGen Advisors LLC | Financial advisors | $ 21,718.00 |
| Printing R Us, Inc. | Check stock | $ 892.77 |
| Red Feather Building | Interviewing space rental | $ 3,390.00 |
| SRI Technologies, Inc. | Recruiter—interviews | $ 6,130.00 |
| Trippe Manufacturing | Time spent by Glenn Haeflinger (approximately 760 hours) | $ 50,075.80 |
| Total | | $230,384.22 |

27. Samir asserts that all remaining $200,000 in Funds are subject to Samir's lien and that those funds may not be used to pay any break up fee to Baricide. Samir filed an objection to the Break–Up Fee Motion. As framed through its written submissions on the matter, Samir objects to the Break–Up Fee Motion on two principal grounds: (i) the Net Sale Proceeds remaining in the Debtors' Account are subject to Samir's superior lien claim, and they therefore constitute Samir's cash collateral that may not be used to pay Baricide's Break–Up Fee without Samir's consent; and (ii) the Haeflinger Charge is not an appropriate element of Baricide's Break–Up Fee in any event because it represents an overhead cost as opposed to an actual expense fitting within the scope of the Sale Procedures Order. Consequently, Samir does not dispute Baricide's entitlement to an allowed administrative expense claim in the amount of $180,308.42 pursuant to the Sale Procedures Order. However, Samir opposes Baricide's request for any payment of that claim from the Net Sale Proceeds remaining in the Debtors' Account unless and until Samir's secured claim is otherwise satisfied in full.

28. Baricide is a "shell" corporation, with the same ownership as Trippe Manufacturing Co. ("Trippe"), that was created for the purpose of acquiring the assets of another company. It is for that reason that some invoices relating to Baricide's efforts to purchase the Purchased Assets were issued to Trippe.

29(a). Among the expenses claimed by Baricide is a $50,075 charge for the time spent by Glen Haeflinger. Mr. Haeflinger is an employee of Trippe. His position is Manager of Acquisitions & Analysis. Prior to working at Trippe, Mr. Haeflinger worked at the investment banking firm of Houlihan Lokey Howard & Zukin ("Houlihan").

(b). Mr. Haeflinger was responsible for negotiating the Baricide Offer. Additionally, Mr. Haeflinger was primarily responsible for all aspects of due diligence and coordination of all service providers.

(c). The $50,075 claim for Mr. Haeflinger's time was calculated based upon an hourly rate of $67.67. The hourly rate was calculated by dividing Mr. Haeflinger's annual salary (including benefits) of $140,750 by 2080 hours.

(d). Mr. Haeflinger served in effect as an "in house" investment banker. If Mr. Haeflinger's services were not utilized, Baricide would have had to hire an investment banker to perform the services rendered by Mr. Haeflinger. The fees for such services would have been substantially more than the $50,075.80 charged for Mr. Haeflinger's time. The time spent by Mr. Haeflinger on this matter represents an "opportunity cost." But for his time on this work, Mr. Haeflinger would have been able to devote 760 hours of his time locating and analyzing other acquisitions for Baricide. Therefore, his time analyzing Debtor's assets was "time" and "resources" of Baricide for which the overbid protection applies under ¶ K of the Sales Procedure Order (Finding No. 11). While some of his hours were properly questioned by Samir, at least $20,000 in the value of his time was established, bringing the Baricide claim to a full and valid $200,000.

30. Additional facts set forth in the Conclusions of Law will stand as further Findings of Fact.

## CONCLUSIONS OF LAW

### Jurisdiction

■ 1. Proceeds from sale of a debtor's assets are property of the bankruptcy estate. *See* 11 U.S.C. § 541(a)(1). Consequently, the proceeds generated from the sale of the Sale Assets, including the Net Sale Proceeds remaining in the Debtors' Account, now constitute property of the estate. *See* 11 U.S.C. § 541(a)(6). Accordingly, core subject matter jurisdiction lies here to hear and determine Baricide's request for payment of a break-up fee as well as its purported right to payment of that fee from the remaining Net Sale Proceeds. *See* 28 U.S.C. §§ 1334(b), 1334(e), 157(b)(2)(A), 157(b)(2)(K), 157(b)(2)(M), 157(b)(2)(O) and Internal Operating Procedure 15 of the United States District Court for the Northern District of Illinois.

### Baricide's Entitlement To A Break–Up Fee

■ 2. In the context of a bankruptcy sale, an unsuccessful bidder's request for the payment of a break-up fee constitutes an administrative expense request, and its allowability should be therefore determined under 11 U.S.C. § 503(b) in the same manner as other administrative expense requests. *See Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.)*, 181 F.3d 527, 535 (3d Cir.1999). Pursuant to the Sale Procedures Order, Baricide's break-up fee was authorized in an amount equal to the "actual expenses" that it incurred in connection with its bid to buy the Sale Assets, subject to a maximum cap of $200,000. *See* Sale Procedures Order, p. 2 at ¶ 2. Consequently, Baricide is entitled to an administrative expense claim to the ex-

tent of its actual expenses incurred in connection with its sale bid but not to exceed $200,000.

3. Except for the Haeflinger Charge of $50,075.80, Samir does not dispute Baricide's entitlement to an administrative expense claim for its requested break-up fee. Based on Facts found hereinabove, Samir's objection to the Haeflinger Charge is overruled. The Haeflinger Charge was an actual expense within the meaning of the Sale Procedures Order.

### Baricide's Claim of Entitlement To Payment From The Net Sale Proceeds

4. In addition to the allowance of its break-up fee, Baricide also requests that payment of the allowed amount of its break-up fee be directed from the Net Sale Proceeds remaining in the Debtors' Account. Samir opposes that request on the grounds that it possesses what is now a senior lien on the remaining Net Sale Proceeds. In this contention Samir is correct; neither expressly nor impliedly was it divested of its lien.

5. Samir filed a proof of claim asserting a secured claim against the Debtors and a corresponding lien on all of its assets in the amount of $1 million plus interest and costs. *See* Samir Proof Of Claim, filed on September 24, 2003. Pursuant to the Sale Order, Samir's liens on the Sale Assets attached to the proceeds "to the same extent and with the same force, validity, status and effect, if any, as they had against the Purchased Assets." *See* Sale Order, p. 5 at ¶ E. *See also In re Allied Products Corp.*, 288 B.R. 533, 536 (Bankr. N.D.Ill.2003) (adequate protection in the context of a sale free and clear of interests typically requires the interests to attach to the proceeds of sale). Through a subsequent final order of this court, Samir's secured claim was allowed as filed. *See*

October 21, 2003 Order Allowing Samir Secured Claim.

6. Due to the lack of any other available proceeds from the Sale Assets to satisfy any portion of Samir's allowed secured claim, Samir has refused to consent to the use of the Net Sale Proceeds to pay Baricide's administrative expense claim for its break-up fee. The resolution of the parties' dispute therefore requires a determination of whether Baricide obtained an interest in the Net Sale Proceeds that is superior to Samir's allowed secured claim. It must be concluded that Baricide failed to establish such a superior interest.

7. Baricide asserts that its right to payment from proceeds of the Sale Assets was determined and granted by this court's Sale Procedures Order. *See* Baricide Response at ¶ 4. Contrary to Baricide's assertion, however, the Sale Procedures Order merely authorizes a break-up fee "in an amount equal to [its] actual expenses up to $200,000." *See* Sale Procedures Order, p. 2 at ¶ 2. Although one of the bidding procedures attached to the Sale Procedures Order states that the fee is to be paid "out of the proceeds of [the] Sale" (*see* Sale Procedures Order, Ex. 1 at ¶ K), that provision, even if enforceable against Samir, does not purport to prime or subordinate any existing liens that would attach to the sale proceeds. In the absence of some enforceable priming lien or right to the sale proceeds, Baricide cannot establish that its claim to the remaining Net Sale Proceeds is superior to the allowed secured claim of Samir.

8. Neither the Sale Procedures Order, the underlying bidding procedures, nor the Sale Order purport to prime or surcharge Samir's lien on the Net Sale Proceeds for the benefit of Baricide and the payment of its break-up fee. In order to grant Baricide a priming or equal lien

on the Net Sale Proceeds to the extent of its break-up fee, the Debtors would have been required to seek and obtain this court's specific authorization after notice and a hearing. *See* 11 U.S.C. § 364(d) (authorizing the incurrence of debts secured by a senior or equal lien on property of the estate that is subject to a pre-existing lien.). The Sale Motion did not contain such a request, and neither the Sale Procedures Order nor the Sale Order purport to grant such a priming lien to Baricide.

9. Likewise, neither the Sale Procedures Order nor the Sale Order purported to allow a surcharge on Samir's collateral interest in the Net Sale Proceeds pursuant to 11 U.S.C. § 506(c). Even if Baricide had sought such a surcharge for payment of its administrative claim pursuant to § 506(c), it lacked independent standing to do so. *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000). Putting the standing issue aside, Baricide would also be precluded on the merits of § 506(c). In order to surcharge Samir's collateral interest in the Net Sale Proceeds, Baricide would be required to demonstrate a benefit *to Samir* from Baricide's efforts as a stalking horse. *See In re Trim–X, Inc.*, 695 F.2d 296, 299–302 (7th Cir.1982) (the recovery of § 506(c) expenses for preserving or disposing of a secured creditor's collateral is appropriate in circumstances where the expenses (i) are necessary, (ii) benefit the secured creditor, and (iii) are reasonable). Considering the fact that Samir has received absolutely no proceeds from the Sale Assets, and cannot receive any proceeds if Baricide prevails, Baricide could not make such a showing even if it had standing on the matter.

10. Baricide argues that the Sale Order impliedly stripped or otherwise diminished Samir's lien on the remaining Net Sale Proceeds. However, it must be concluded that the Sale Order had no such effect. As that Order stated, Samir's lien on the Sale Assets was "transferred to and attach[ed] to the proceeds of the sale of the [Sale] Assets to the same extent and with the same force, validity, status and effect, if any, as they had against the [Sale] Assets." *See* Sale Order, p. 5 at ¶ E. The Sale Order then authorized a specified series of payments that the Debtors were directed to make. *See* Sale Order, p. 5 at ¶¶ T–U. It then directed the remaining proceeds to be deposited into an account "in Debtor's name" (*see* Sale Order, p. 5 at ¶¶ W–X), which in turn could only be distributed "pursuant to the further Order of this Court." *See* Sale Order, p. 5 at ¶¶ W–X. Except for the specific payments that were expressly directed pursuant to the Sale Order, Samir's lien on the sale proceeds was maintained in all respects. *See* Sale Order, p. 5 at ¶ S ("Except as expressly set forth herein, any and all distributions of the proceeds of Sale shall be made pursuant to the further Order of this Court").

11. Baricide contends that Samir's lien did not attach to the Net Sale Proceeds because the Sale Order stated that "sufficient funds from the proceeds of Sale (representing amounts for cure costs to be paid at the closing of the Sale and $200,000 reserved for break-up fees) shall be deposited into" the Debtors' Account. *See* Sale Order, p. 5 at ¶¶ W–X. Though that provision of the Sale Order and its consequent escrow described the use originally anticipated for that portion of the sale proceeds when the Sale Order was entered, it certainly did not expressly or impliedly strip Samir's lien from those proceeds, alter the Debtors' ownership of those proceeds, or vest any superior rights to those proceeds in favor of Baricide. *See Allied Building*

*Products Corp. v. Midway Airlines, Inc. (In re Midway Airlines, Inc.)*, 1993 WL 243935 at *8 (Bankr.N.D.Ill.1993) (the mere creation of an escrow by a debtor to hold sale proceeds creates no rights in favor of parties claiming an interest in the proceeds), *aff'd*, 163 B.R. 514 (N.D.Ill. 1993); *In re BNT Terminals, Inc.*, 125 B.R. 963, 968–69 (Bankr.N.D.Ill.1990) (the creation of an escrow to hold proceeds from a sale of a debtor's asset does not divest the estate from its ownership interest in those proceeds). Consequently, it is concluded that the Sale Order did not alter Samir's lien on the Net Sale Proceeds remaining in the Debtors' Account. With the full satisfaction and release of all senior liens and security interests on the Debtors' assets as a result of the distribution of substantially all of the proceeds from the Sale Assets, the Samir secured claim stands next in priority for payment from the Net Sale Proceeds remaining in the Debtors' Account.

### CONCLUSION

This is not a conclusion or ruling that is helpful to the bankruptcy sale process, because Baricide did help make a market that resulted in full benefit to the senior lienor. In that situation, payment of an overbid fee for expenses incurred by the initial bidder makes economic sense. Once such a fee is approved, any court would want to implement that approval so that future bidders can rely on similar approval in future cases and thus be encouraged to bid. But fairness to Baricide whose work and expense benefitted the senior lienor can hardly be enforced out of Samir's lien rights. "Stalking horse" bidders must negotiate protection against lienor claims to sale proceeds or risk this outcome.

For reasons stated and upon the authorities cited herein, this court sustains Samir's objection and (i) allows Baricide's break-up fee as a chapter 11 administrative expense in the amount of $200,000, (ii) denies Baricide's request for an order directing the payment of its allowed administrative expense claim from the $200,000 Net Sale Proceeds remaining in the Debtors' Account, and (iii) orders payment of the Net Sale Proceeds to Samir as creditor secured thereby.