**In re TEXAS RANGERS BASEBALL PARTNERS, Debtor.**

**No. 10–43400 (DML).**

United States Bankruptcy Court,
N.D. Texas,
Fort Worth Division.

July 30, 2010.

Martin A. Sosland, Weil, Gotshal & Manges, LLP, Dallas, TX, Ronit J. Berkovich, Weil, Gotshal & Manges, LLP, New York, NY, J. Robert Forshey, Jeff P. Prostok Forshey & Prostok, LLP, Fort Worth, TX, for Debtor.

Lisa Laura Lambert, Meredyth Kippes, Office of the United States Trustee, Dallas, TX, for United States Trustee.

Daniel I. Morenoff, Jeffrey R. Fine, K & L Gates LLP, Dallas, TX, for Official Committee of Unsecured Creditors.

Michael Joseph Small, Foley & Lardner LLP, Chicago, IL, Tom Lauria, White & Case, L.L.P., Miami, FL, Glenn Kurtz, White & Case, L.L.P., New York NY, Craig H. Averch, White & Case, L.L.P., Los Angeles, CA, Robert A. Simon, Barlow, Garsek & Simon, LLP, Fort Worth, TX, Mary K. Braza, Foley & Lardner, Milwaukee, WI, for Rangers Baseball Express, LLC.

Thomas K. Schulte, David A. Sullivan, Jennifer C. DeMarco, Andrew Brozman, Jeff E. Butler, Laura J. McLaren, Clifford Chance U.S. LLP, New York, NY, Holland N. O'Neil, Gardere Wynne Sewell, LLP, Andrew G. Spaniol, Gardere Wynne Sewell, LLP, Dallas, TX, for GSP Finance LLC.

Stephen J. Shimshak, Philip A. Weintraub, Jordan E. Yarett, Brad S. Karp, Diane Meyers, William B. Michael, Erica

G. Weinberger, Susanna M. Buergel, Paul, Weiss, Rifkind, Wharton, & Garrison LLP, New York, NY, Briana Leigh Cioni, Peter C. D'Apice, Heather J. Panko, Stutzman, Bromberg, Esserman & Plifka, PC, Dallas, TX, for Office of the Commissioner of Baseball.

Melinda C. Franek, Joseph S. Fabiani, Latham & Watkins, LLP, New York, NY, Michael R. Buzz Rochelle, Esq., Scott Mark DeWolf, Rochelle McCullough, LLP, Dallas, TX, for JP Morgan Chase.

Dennis F. Dunne, Dennis C. O'Donnell, Milbank, Tweed, Hadley & McCoy LLP, New York, NY, Andrew M. Leblanc, Aaron L. Renenger, Milbank, Tweed, Hadley & McCoy LLP, Washington, DC, Daniel C. Steward, Daniel C. Stewart, Esq., Vinson & Elkins, L.L.P., Paul E. Heath, Dallas, TX, for Ad Hoc Group of First Lien Lenders.

### *Memorandum Opinion and Order*

DENNIS MICHAEL LYNN,
Bankruptcy Judge.

Before the court is the *Emergency Joint Motion of Lender Parties for Reconsideration of Court's Order Adopting Bidding Procedures* (the "Motion"), filed jointly by the Ad Hoc Group of First Lien Lenders (the "Ad Hoc Group"), GSP Finance LLC, as agent for the second lien lenders ("GSP") and JPMorgan Chase Bank, N.A., as agent for the First Lien Lenders (together with the Ad Hoc Group and GSP, the "Lenders"), by which the Lenders ask that the court reconsider its *Order Adopting Bidding Procedures* (the "Procedures Order") entered in this chapter 11 case on July 15, 2010. The court also has before it the *Limited Joinder of Rangers Equity Holdings, L.P. and Rangers Equity Holdings GP, LLC in Emergency Joint Motion of Lender Parties for Reconsideration of Court's Order Adopting Bidding Procedures* (the "Joinder"), filed by Rangers

Equity Holdings, L.P. and Rangers Equity Holdings GP, LLC (collectively, the "Rangers Equity Owners") through their chief restructuring officer, William Snyder ("Snyder"). Rangers Baseball Express LLC ("Express") filed its *Preliminary Objection of Rangers Baseball Express LLC to the Lender Parties' (1) Emergency Motion for Reconsideration of Court's Order Adopting Bidding Procedures (and the Limited Joinder of Rangers Equity Holdings, L.P. and Rangers Equity Holdings GP Therein), (2) Motion for Emergency Hearing, and (3) Motion to File Under Seal* and thereafter its *Supplemental Objection of Rangers Baseball Express LLC to the Lender Parties' (1) Emergency Motion for Reconsideration of Court's Order Adopting Bidding Procedures (and the Limited Joinder of Rangers Equity Holdings, L.P. and Rangers Equity Holdings GP Therein), (2) Motion for Emergency Hearing, and (3) Motion to File Under Seal.* The Office of the Commissioner of Baseball (the "BOC") and Debtor also responded opposing the Motion, and the Lenders then filed a response to the various oppositions.

On request of the Lenders, the court heard the Motion on an expedited basis over the period of July 20–22, 2010 (the "Hearing"). At the Hearing the court heard testimony from Snyder; Salvatore Galatioto ("Galatioto"), principal of GSP; Nolan Ryan ("Ryan"), president of Debtor and a principal of Express; Chuck Greenberg ("Greenberg"), a principal of Express; Ron Washington ("Washington"), on-field Manager of the Texas Rangers Baseball Club (the "Rangers"); and Kevin Cofsky ("Cofsky"), an investment banker with Debtor's financial advisor Perella Weinberg Partners LP ("Perella"). The court also received into evidence exhibits, identified as necessary below, and heard argument by the parties.

This matter is subject to the court's core jurisdiction. 28 U.S.C. §§ 1334 and 157(b)(2)(A), (C), and (M). This memorandum opinion and order embodies the court's findings of fact and conclusions of law. FED. R. BANKR.P. 9014 and 7052.[1]

## I. Background

The events leading to Debtor's commencement of this chapter 11 case are generally described in the court's memorandum opinion of June 22, 2010 (the "Prior Opinion").[2] Since entry of the Prior Opinion, Snyder was appointed to oversee the conduct of the Rangers Equity Owners.[3]

Prior to commencement of this case, Debtor and Express entered into an asset purchase agreement (the "APA")[4] by which Express would purchase the assets of Debtor including the Rangers. Upon filing its chapter 11, petition Debtor also filed a plan of reorganization (the "Plan")[5] by which it proposed to implement the APA. In the Prior Opinion the court made clear that, in order to confirm the Plan, either the Rangers Equity Owners (i.e.,

Snyder) would have to accept the Plan or it would have to be proven at the confirmation hearing that the Rangers Equity Owners would receive in a chapter 7 case no more from a sale of the Rangers than the price provided in the APA. See Code § 1129(a)(7).

Following his appointment, Snyder learned of and made contact with several potential bidders interested in acquiring the Rangers. Having concluded that the best proof of the adequacy of the price to be paid by Express pursuant to the APA would be an auction of the team, in which other bidders might participate,[6] Snyder negotiated with Express, Debtor and other parties, seeking to agree on bidding procedures to market-test the APA.

On July 5, 2010, directed to do so by Snyder, Debtor filed a motion seeking approval of the bidding procedures so negotiated (the "Debtor's Procedures Motion"). The following day, however, Snyder determined that the procedures he had negotiated were not workable (for some of the

---

1. In considering the Motion, the court takes account of prior proceedings in this chapter 11 case. See Nantucket Investors II v. Cal. Fed. Bank (In re Indian Palms Assocs. Ltd.), 61 F.3d 197, 203 (3d Cir.1995). The court notes, however, that it does not in this opinion consider any motions filed or hearings held after July 22, 2010.

2. In re Texas Rangers Baseball Partners, Case No. 10–43400, Memorandum Opinion (dkt.257) (Bankr.N.D. Tex. June 22, 2010).

3. The court's order appointing Snyder was entered on June 28, 2010. This order provided, inter alia, that Snyder would control the vote of the Rangers Equity Owners under section 1126 of the Bankruptcy Code (the "Code") (11 U.S.C §§ 101 et seq.) and would have authority over decisions by the Rangers Equity Owners respecting matters outside the ordinary course of their business, other than decisions related to the baseball operations of the Rangers.

4. The APA replaced an earlier asset purchase agreement (the "First APA") and has been amended since commencement of this chapter 11 case. The amendments to the APA are only relevant in the present context to consideration of the Lenders' argument that Express's equity financing has been lost, in that the equity contributions were limited to effecting consummation of the First APA.

5. The Plan has also been amended since the commencement of Debtor's chapter 11 case. See Prior Opinion, p. 1, n. 1, and p. 15, n. 25.

6. At the Hearing, Snyder testified that he sought resolution of Debtor's chapter 11 case either through receiving what he saw as a fair price for the Rangers or through sale of the Rangers through a fair process. See Snyder's testimony, Hearing Transcript, 7/20, 17:7–18:12 (hereafter, transcript citations will be in the following form: Speaker's Name, date, page:line numbers).

same reasons he objected in the Joinder to the bidding procedures adopted by the court by the Procedures Order (the "Approved Procedures")). Consequently, Snyder withdrew the Rangers Equity Owners' support for the Debtor's Procedures Motion and Debtor withdrew that motion.

Subsequently, on July 12, 2010, Express commenced an adversary proceeding against Debtor (the "Adversary"), seeking to enforce certain provisions of the APA. In connection with the Adversary, Express sought a temporary restraining order by separate motion. That motion in effect proposed that the court adopt certain bidding procedures that were the same, in most respects, as those proposed by the Debtor's Procedures Motion. The following day, by another motion, Debtor proposed yet another, similar set of bidding procedures.

Determining that, as its thrust was to establish bidding procedures, Express's motion seeking a temporary restraining order was more properly considered as a contested matter in Debtor's chapter 11 case rather than as part of the Adversary (*see* order dated July 15, 2010,[7] directing same, and authorities cited therein), the court held a hearing on July 13, 2010. At that time, the court presented to the parties a draft of proposed bidding procedures, based on the form used by Express and Debtor and modified by the court. Following argument by the parties, the court announced that it would adopt its procedures with certain further modifications. It directed the Rangers Equity Owners to make modifications to the existing draft and invited parties to comment by the afternoon of July 14 on the result. Following receipt of the revised draft and review of comments received, the court completed its formulation of procedures, in the form of the Approved Procedures, which it then implemented by the Procedures Order.

Noting that the court adopted the Approved Procedures without the benefit of an evidentiary record, the Lenders then filed the Motion. Though the court, for reasons given below, believed it necessary to enter the Procedures Order as soon as possible, and though the court believed it had sufficient basis for doing so, it promptly set the Motion and allowed the parties to address the fairness of the Approved Procedures at the Hearing.

## II. The Court's Exercise of Authority

Though no party has challenged the authority of the court to author and adopt bidding procedures for sale of a debtor's assets, it is worth pointing out that it is clear the court has that power. Section 363(b)(1) of the Code permits sale of estate property outside the ordinary course of business "after notice and a hearing." What constitutes proper notice and opportunity for a hearing is largely left to the court's discretion. *See* Code § 102(1); 2 COLLIER ON BANKRUPTCY ¶ 102.02[1] (15th ed. rev.2007). Section 105 of the Code gives the court the authority to enter orders necessary to carry out the provisions of the Code, including administration of the assets in the court's custody. *See* 2 COLLIER ON BANKRUPTCY ¶ 105.04 (15th ed. rev.2005). From these provisions it is clear the court may regulate the mechanism of a sale outside the ordinary course. Indeed, the court may even affect the sale of property by a trustee *in* the ordinary course. Code § 363(c)(1) ("unless the court orders otherwise, the trustee may enter into transactions . . .").

---

7. *Rangers Baseball Express LLC v. Texas Rangers Baseball Partners (In re Texas Rangers Baseball Partners),* Adversary No. 10–04121, Order (dkt.18) (Bankr.N.D.Tex. July 15, 2010).

■ As to why it would exercise that authority as it did, the court believed (and now finds) that the APA is subject to severe time constraints. Specifically, if Express does not close under the APA by August 12, 2010, its ability to finance the transactions contemplated by the APA will end.[8] While it may well be that, as the Lenders maintain, a better offer than that represented by the APA will materialize, the court does not at this writing · have sufficient evidence before it to so conclude.

Thus, while the Lenders are content to let the Plan proceed to a confirmation hearing on the assumption that the Plan cannot be confirmed absent a test of the APA in the market, and so would accept the loss of the APA and Express as a potential purchaser of the Rangers, the court is not so inclined. Rather, the court concluded that it was necessary to have in place bidding procedures that would provide a reasonable opportunity for the APA to be tested against the market. If, as the court anticipates, the Approved Procedures prove a sufficient test of Express's purchase price, then this case may be concluded without the necessary loss of the APA.

In addition to facing time constraints, the court was familiar with the procedures proposed by the Debtor's Procedures Motion. As those procedures were negotiated by Snyder, the court considered them a fair measure for formulating procedures that would address concerns previously expressed by the parties. The court was also generally aware of the discussions between Snyder and potential bidders for the Rangers other than Express. Based on this knowledge, the court felt able to author adequate procedures; the court also saw no other way to establish procedures in the time available than through its imposition of them.[9] After taking account of arguments made at the July 13 hearing and the comments submitted on July 14, the court concluded that entry of the Procedures Order was appropriate [10]— and, given the time constraints, necessary to be done without delay. Though the court has now entertained and considered

---

**8.** *See* Greenberg, 7/21, 42:14–44:20, and 7/20, 48:24–49:21; Snyder, 7/20, 72:20–73:13; Express Exhibits 1 and 20A. Though the Lenders question Greenberg's construction of Express Exhibit 1 (a sample equity subscription letter), contending that his conclusion that there is an August 12 deadline after which equity subscriptions must be returned is erroneous, the court agrees that Greenberg's is the better interpretation of the document. The court also rejects as a strained construction of Express Exhibit 1 the Lenders' argument that the equity contributions must be returned because Express will not be consummating the First APA. The court accepts Greenberg's testimony that Express would have the authority to modify the APA so long as it achieves the ends originally contemplated.

**9.** Snyder, though conceding that the Approved Procedures represented a substantial improvement over his efforts and were "pretty good," suggested that the bidders (and presumably interested parties) should negotiate changes to them. *See* Snyder, 7/20, 33:14–

34:6. The court doubts that the various parties could reach agreement on bidding procedures in any reasonable amount of time.

**10.** During the Hearing the court compared the Approved Procedures to those negotiated by Snyder and proposed by the Debtor's Procedures Motion. *See* Snyder, 7/20, 164:10–171:14. Snyder conceded that the Approved Procedures addressed his two primary concerns with the procedures that he originally proposed in the following exchange:

> THE COURT: Okay. Now, Mr. Snyder, as I understand it, and perhaps I'm mistaken, the two greatest concerns you have is the ability to proceed under Section 363 and the timing, correct?
> THE WITNESS: Exactly.
> THE COURT: Okay. Now, the existing bidding procedures give you the ability to proceed under Section 363, correct?
> THE WITNESS: Correct.
> THE COURT: Okay. And as for the timing, essentially it requires that the bid be avail-

the Motion, in the Procedures Order it directed that the Approved Procedures be implemented immediately, which it understands has occurred.

### III.  Issues

The Lenders and Snyder raise two issues with the Approved Procedures. First, they argue that the time allowed other bidders under the Approved Procedures is inadequate for completion of due diligence and for competing bidders to obtain financing.  Second, they contend that that the stalking horse protections afforded Express are unnecessary and overly generous.[11]

### IV.  Discussion

#### A.  Timing

■ The Approved Procedures establish August 4, 2010, as the date for, first, an auction of Debtor's assets if there are multiple bidders, and, second, confirmation of the Plan. This date is necessary if the APA is to close by August 12 because of certain pre-conditions to closing, including approval of Express by the requisite majority of team owners as required by the Constitution of Major League Baseball.  Thus, while the court agrees that it might be better to defer the auction,[12] the August 4 date is necessary to preserve the APA.

Prospective bidders have been on notice since immediately following commencement of Debtor's chapter 11 case (by May 26, 2010) that other bids than that of Express for purchase of the Rangers would be entertained.[13]  Indeed, other potential bidders have been in contact with Debtor and Snyder, and at least two of them

able in time for August 4th [as opposed to July 22 as proposed by the Debtor's Procedures Motion], but it allows a potential bidder time after that in excess of two months within which to put his financing together, right?

THE WITNESS:  I believe so, on the financing, yes.

Snyder, 7/20, 171:15–172:3.

Other changes that improved on the procedures proposed by the Debtor's Procedures Motion included a reduction in the breakup fee, court oversight of BOC and Major League Baseball approval, the ability to change the asset mix in the transaction and the ability to alter the form of purchase agreement.

11.  The Lenders and/or Snyder raised other issues that the court understands they concede have been addressed in the Approved Procedures.  For example, Snyder considers it essential that a sale of the Rangers be possible under Code § 363 as well as a plan. The Approved Procedures allow for sale under section 363.  Likewise, the Approved Procedures allow for sale of a lesser group of assets than provided by the APA, so allowing for preservation of causes of action respecting certain transactions undertaken by Debtor on the eve of its chapter 11 filing, as discussed below.

12.  In argument at the Hearing, the Lenders suggested September 30 for the auction.  Not only would that date necessarily mean Express's exclusion from bidding, but Snyder's testimony did not give the court confidence that bidders would in fact find even that date satisfactory.  See Snyder, 7/20, 161:22–162:15.  The court is also concerned that a hiatus between now and September 30, during which disposition of the Rangers is so uncertain, would have an adverse effect on the team's performance, on-field and otherwise.  See, e.g., Ryan, 7/21, 12:21–13:18; Washington, 7/22, 10:2–19.  The Rangers, at this writing, are in first place in their division. If they continue to win, they are likely to be serious contenders in post-season play.  This will substantially enhance the team's value.

13.  During the hearing on May 26, the court said:

Let me make it very clear.  It would be my view that the Debtor–in–Possession has an obligation to at least explore to some extent alternatives that may be available to it as alternatives to the asset purchase agreement and the presently filed plan of reorganization.

The court, 5/26, 108:6–10;  see also The court, 5/26, 152:2–18.

participated in a mediation session among the parties on July 6.[14] The court concludes that the small universe of potential bidders and the common knowledge that the Rangers are for sale offsets in large part the shortness of time between the adoption of the Approved Procedures and the August 4 auction.

## 1. Due Diligence

The court does, however, appreciate the concern of Snyder and the Lenders respecting due diligence. From adoption of the Approved Procedures to the date of auction is less than a three-week period. Further, before a bidder may commence due diligence it must be qualified by the BOC. *See* Approved Procedures, pp. 3–5, "MLB Sales Clearance."

On the other hand, two or more potential bidders have been qualified (*see id.*), the BOC has promised to act promptly (and has done so) as to other potential bidders, and the court will promptly, on motion, review a refusal by the BOC to grant clearance (*see id.*). Moreover, those two qualified potential bidders as well as others had access to Debtor's data room during the prepetition auction that resulted in selection of Express as purchaser of the Rangers and ultimately Debtor's execution of the APA.[15] Finally, Cofsky testified that none of the potential bidders with which he has communicated have expressed that they would be unable to make a bid by August 4. He also testified that one potential bidder affirmatively told him that it would have sufficient time to submit a bid if it chose to do so.[16]

Nor are the time limits imposed by the Approved Procedures extraordinary for bankruptcy sales. *See, e.g., In re GMC,* 407 B.R. 463 (Bankr.S.D.N.Y.2009); *In re Bombay Co.,* 2007 WL 2826071, 2007 Bankr.LEXIS 3218 (Bankr.N.D.Tex. Sept. 26, 2007); 3 COLLIER ON BANKRUPTCY ¶ 363.02[3] (16th ed.2010). While those cases may have involved wasting assets, the court considers the time sensitivity of the APA similarly to justify setting the time of the auction to accommodate Express. *Cf. In re Chrysler LLC,* 405 B.R. 84, 95 (Bankr.S.D.N.Y.2009). Given that the Rangers are constantly in public view and that their principal obligations—players' contracts—are the subject of endless news stories, the court believes due diligence by bidders is not the sort of inquiry that would, by reason of mystery surrounding Debtor's assets and liabilities, daunt a serious prospective purchaser.

For the foregoing reasons, the court concludes that, notwithstanding difficulties prospective bidders may encounter in completing due diligence, the time period leading up to the August 4 auction is sufficient and a necessary limitation in the Approved Procedures.

## 2. Financing

The court is less concerned about prospective bidders finding financing. The necessary wealth of potential purchasers is only part of the reason for this;[17] the

---

**14.** *See* Snyder, 7/20, 24:16–26:7, and 88:24–89:16.

**15.** Counsel for Debtor stated during argument that one or more potential bidders also had access to the data room after commencement of the chapter 11 case and before entry of the Procedures Order. The court, however, does not consider this at this time supported by admitted evidence.

**16.** *See* Cofsky, 7/22, 24:21–25:15, and 72:1–10.

**17.** Assessment of financial ability is part of the MLB qualification process and is provided for in the Approved Procedures.

court is also persuaded by the components of the purchase price being paid for the Rangers. The consideration of approximately $520,000,000 [18] to be paid by Express may be broken down into three parts. First, Express will assume approximately $220,000,000 of Debtor's liabilities. Second, approximately $220,000,000 will pass directly or through the Rangers Equity Owners to the Lenders. The remaining balance of about $80,000,000 will be paid following closing to other creditors.

Obviously, though they may affect the views of prospective lenders, assumed liabilities do not require immediate recourse to financing.[19] As to the sums to be paid to the Lenders, whether through agreement of the Lenders or by impairment *via* a modification of the Plan,[20] payment may be deferred while permanent financing is sought. That leaves an amount—approximately $95,000,000 (the $80,000,000 balance plus the $15,000,000 required by the Approved Procedures for an initial overbid)—which, while certainly large, the evidence suggests is manageable by those potential bidders identified to date.[21]

Alternatively, the Approved Procedures include a mechanism by which a bidder may become the Successful Bidder [22] by posting a deposit and deferring closing to October 11. This would afford the prospective bidder more than two months to fully finance its purchase of the Rangers.[23]

The court, given the time constraints it must account for, has thus provided at least two options to allow a bidder to avoid the need to come up with financing in the short term. The court therefore concludes that, except to the extent of allowing for amendments to the Plan to facilitate the purchase,[24] the Approved Procedures do not require alteration to their timing to allow for financing.

## B.   The Breakup Fee

■   The Approved Procedures establish Express and the APA as a stalking horse bid. The court also established protections, including, as an alternative to proving rejection damages should the APA not be consummated, an all-inclusive breakup fee of the greater of $10,000,000 and 125% of Express's actual costs and damages. *See* Approved Procedures, p. 11, "Stalking

---

**18.** The $520,000,000 estimate is taken from Snyder's testimony. Snyder, 7/20, 62:15–23. After analyzing the various documents, the court concludes that $520,000,000 is a fair approximation of the total consideration to be paid under the APA for the Rangers. This estimate does not include any consideration being offered for the parking lots that Express also proposes to purchase.

**19.** Some of the liabilities assumed (or to be paid) under the APA relate to the eve-of-filing transactions discussed below and may not be necessary to exceed Express's bid.

**20.** As the court stated at the Hearing, proof that Lenders holding a majority in number and a 2/3 majority in amount of claims of the Lenders would agree to such treatment would satisfy the court that the bidder was financially capable. The Court, 7/22, 114:19–117:4; *see also* Galatioto, 7/20, 274:21–275:24.

**21.** *See* Galatioto, 7/20, 224:23–228:15; *see also* Cofsky, 7/22, 24:15–20.

**22.** "Successful Bidder" is afforded the same meaning it was given in the Approved Procedures.

**23.** This mechanism requires the bidder, upon becoming the Successful Bidder, to post a $15,000,000 deposit (either 50% more or 50% less than the deposit offered by one prospective bidder in a deal contemplated in 2009; *compare* Snyder, 7/20, 168:17–21 *with* Cofsky, 7/22, 45:14–18).

**24.** Express is also free to either pursue the APA through a section 363 sale or to request amendments to the Plan to accommodate improvements to its bid.

Horse" Protections. The Lenders contend that the breakup fee is unnecessary, is too much and will chill bidding by allowing Express a type of credit bid.[25]

First, as to the need for a breakup fee, the procedures negotiated by Snyder and proposed by the Debtor's Procedures Motion included a breakup fee that was greater than that provided in the Approved Procedures.[26] Further, at the time the Adversary was commenced, Snyder, the court learned during the Hearing, was negotiating with another bidder to serve as stalking horse—presumably with the benefit of a breakup fee similar to that proposed by the Debtor's Procedures Motion. Finally, the breakup fee is provided as an alternative to litigation.[27] Avoidance of litigation and the inherent benefits of having a stalking horse (*see, e.g., In re Bender Shipbuilding & Repair Co.,* 2009 WL 5386128, 2009 Bankr.LEXIS 4257 (Bankr. S.D.Ala. Dec. 30, 2009)) justify a breakup fee in this case.[28]

Second, the magnitude of the breakup fee is not excessive. Cofsky testified that the amount of the fee, at approximately 2% of the purchase price, is in line with similar, non-bankruptcy transactions. Cofsky, 7/20, 26:1–14, and 65:8–14. The court has found other bankruptcy cases in which breakup fees of as much as 4% have been approved. *See, e.g., In re Metaldyne Corp.,* 409 B.R. 661, 670 (Bankr.S.D.N.Y. 2009); *In re CXM, Inc.,* 307 B.R. 94 (Bankr.N.D.Ill.2004); *In re Hupp Indus., Inc.,* 140 B.R. 191 (Bankr.N.D.Ohio 1992). Furthermore, it is not uncommon for an agreement to provide for payment of the stalking horse's expenses in addition to a breakup fee. *See, e.g., Unsecured Creditors Comm. v. Belgravia Paper Co. (In re Great Northern Paper, Inc.),* 289 B.R. 497 (D.Me.2003); *In re Tropea,* 352 B.R. 766 (Bankr.N.D.W.Va.2006). The breakup fee provided for in the Approved Procedures is inclusive of all claims Express might make.

However, the court erred in establishing the 125% alternative to the $10,000,000 breakup fee. By providing that Express would be entitled to the *greater of* $10,000,000 and 125% of its allowable costs and expenses, the court guaranteed that Express could seek to enhance its recovery by proving up excessive costs. Nor did the court intend that the breakup fee might approach, let alone exceed, the $15,000,000 initial overbid provided for in the Approved Procedures. Thus those procedures must be modified such that (1) Express must elect whether to rely on the

---

**25.** The Lenders' assumption is that any overbid, in order to be the highest and best bid, must be higher than the last bid by Express by at least as much as the breakup fee. As the court explained during the Hearing, that is simply not the case. To prevail at the auction as the highest bidder, Express must make the highest bid. If it does not do so, the court will not (unless on some basis, other than net realization, it is the best bid) approve a sale to Express.

**26.** *See* Exhibit B of Debtor's Procedures Motion (dkt.310), p. 5, n. 2; *see also* Debtor's Procedures Motion, p. 6.

**27.** Because the APA was entered into prepetition, if it is not performed by Debtor—*i.e.,* if it

is rejected—Express may assert an unsecured claim against Debtor. Code §§ 365(g)(1) and 502(g)(1). The Lenders argue that such a claim is limited to a $1,500,000 breakup fee provided to Express by the APA (Express contends its breakup fee under the APA is $10,000,000). Express, on the other hand, argues that its rejection claim would be for the difference between its bid under the APA and the Successful Bidder's bid. The court reaches no conclusion here as to which, if either, interpretation of Express's potential unsecured claim is correct.

**28.** *See* 3 COLLIER ON BANKRUPTCY ¶ 363.02[7] (16th ed.2010). The breakup fee here provides a floor price for the Rangers.

125% calculation or accept the $10,000,000 *before* the court determines which of its costs and expenses are allowable; and (2) in no event may the 125% calculation exceed $13,000,000.

## C. The Eve–of–Filing Transactions

Both Snyder and the Lenders expressed concern about certain transactions between Debtor and various of its "insiders" on the eve of the chapter 11 filing. Snyder claims these transactions necessitate selling the Rangers under section 363 of the Code rather than pursuant to the Plan in order to preserve the ability to attack those transactions. Under the Approved Procedures, sale of the Rangers may occur pursuant to section 363. *See* Approved Procedures, p. 5, "The Bidding Process." Further, the Plan could be modified to preserve for post-confirmation pursuit of causes of action arising from those transactions. *See* Code § 1123(b)(3)(B); *Nat'l Benevolent Ass'n of the Christian Church v. Weil, Gotshal & Manges, LLP (In re Nat'l Benevolent Ass'n of the Christian Church)*, 333 Fed.Appx. 822, 825–28 (5th Cir.2009); *Dynasty Oil & Gas, LLC v. Citizens Bank (In re United Operating, LLC)*, 540 F.3d 351, 355–6 (5th Cir.2008); *Spicer v. Laguna Madre Oil & Gas, LLC (In re Tex. Wyo. Drilling, Inc.)*, 422 B.R. 612, 626 (Bankr.N.D.Tex.2010); *Moglia v. Keith (In re Manchester, Inc.)*, 2009 WL 2243592, at *2, 2009 Bankr.LEXIS 2003, at *5 (Bankr.N.D.Tex. July 16, 2009).

Additionally, the Lenders argue that the Approved Procedures are flawed because "it is impossible for ... potential bidders—in the time allotted ...—to negotiate their own separate agreements [for transfer of the assets transferred on the eve-of-filing] with the parties that in fact have the right to transfer them." Motion,

p. 16. Yet, if agreements must be negotiated respecting assets transferred into or out of Debtor, those transfers must either be taken into account in the negotiations or avoided before the Rangers may even be sold. The former route strikes the court as difficult if not impossible; the latter would require many months, if not years, of litigation under fraudulent transfer or other theories before a sale of the Rangers might occur.

It is preferable that a bidder either exclude tainted assets from its bid or that Debtor's estate (or any other successor entity) or other party that may make the claim preserve the ability to recover damages resulting from the eve-of-filing transactions. The former is specifically allowed for by the Approved Procedures. *See* Approved Procedures, p. 1, n. 3, "Assets to be Sold." The latter option is not foreclosed by the Approved Procedures and is consistent with, *inter alia,* Code § 1123(b)(3) and applicable case law.

The court is acutely aware that Debtor is under the indirect control of Thomas O. Hicks ("Hicks"), for whose benefit it is alleged that the prefiling transactions were undertaken. Further, Debtor's president—Ryan—is a principal of Express. The Approved Procedures leave much control of disposition of the Rangers under Debtor's control. The court assumes Debtor will act in good faith, on the advice of Perella, its financial advisor, in evaluating bids under the Approved Procedures; Hicks's legitimate interest in Debtor's chapter 11 case is limited to ensuring that claims and rights he may have that are ultimately sustained by the court are protected: *i.e.,* that he will receive any moneys he is eventually found to be entitled to.[29] Should Debtor, contrary to the

---

**29.** To the extent the APA or the Plan proposes indemnities or releases for Hicks at Debtor's

direct or indirect expense, absent a meaningful contribution by Hicks, they are probably

court's expectations, prove overly attentive to Hicks's interests and opinions in administering the Approved Procedures, the court will act to expand Snyder's authority or otherwise protect the interests of the Lenders and Debtor's other creditors.

## V. Conclusion

The court recognizes the Approved Procedures are not necessarily the optimal way to resolve this chapter 11 case. It is possible, as the Lenders and the Ranger Equity Owners argue, that no bidder will come forward to compete with Express at the auction. Should that be the case, Debtor and Express will have the burden of showing that the Approved Procedures indeed provided an effective market test of the APA.

While such a showing may not be a low bar, it is by no means impossible to make. First, the evidence elicited at the Hearing provides substantial support for the conclusion that the Approved Procedures will satisfactorily market-test the APA. Second, it might be shown (though, of course, the court at this time makes no such finding) that prosecution of the Motion may have chilled bidding under the Approved Procedures in two ways, thus explaining the potential absence of competing bidders. In the first place, rather than working toward a sale of the Rangers, the parties spent the first week after entry of the Procedures Order distracted by the Motion and the Hearing. In the second place, by highlighting the Lenders' opposition to and the deficiencies in the Proposed Procedures, the Motion and the Hearing

may have dissuaded bidders from participating in the process. Not only were potential bidders' attention called to weaknesses in the Approved Procedures,[30] but they may well also have been left with the impression that the Approved Procedures will lead not to a sale of the Rangers but rather to yet another round of negotiation and bidding leading to an auction some time in the distant future.

No bidder should so assume. Indeed, if even one bidder appears to compete with Express, the court will most likely conclude the market-test of the APA was fair. Certainly if there is a second bidder, any party contending the Approved Procedures were nevertheless inadequate will bear a heavy burden. It is thus in every party's interest to make a success of the Approved Procedures.

For the reasons stated above, the Motion is granted to the following limited extent:

It is **ORDERED** that

1. Page 11 of the Approved Procedures, titled "Stalking Horse Protections," following the colon in the sixth line and to the end of that sentence, is amended to read:

"at its election, made within five days after Closing, either (a) $10,000,000 or (b) 125% of such actual, proven out-of-pocket damages, costs and expenses, including but not limited to professional fees of the Proposed Buyer, as the Bankruptcy Court may approve; provided, however, such 125% calculation shall not exceed $13,000,000."

invalid. *See Bank of New York Trust Co., NA v. Official Unsecured Creditors' Comm. (In re Pacific Lumber Co.),* 584 F.3d 229, 251–3 (5th Cir.2009). To the extent Hicks is to receive other benefits, generous beyond the fair value of his actual contribution to the transactions contemplated by the APA, the court would respectfully suggest Express amend the APA

either to reduce the return to Hicks and improve it to the Ranger Equity Owners or to preserve rights of suit against him.

**30.** But not strengths, such as the retention by the court of authority to review disapproval of bidders by the BOC or Major League Baseball team owners.

2. To the extent necessary, the Approved Procedures are clarified to permit modification of the Plan and to permit Express to modify either the APA or the Plan to exclude assets or improve the recovery payable or likely to be payable to the Rangers Equity Owners.

3. If a dispute arises respecting the highest and best bid,[31] the court will resolve that dispute. In that regard, other than with respect to the first overbid, the stalking horse protections will not be considered in evaluating any bid.

4. This memorandum opinion and order, together with the underlying record, will be subsumed in the record of any confirmation or sale approval hearing in this chapter 11 case.

31. Return to creditors—including the Lenders' recovery from the Rangers Equity Owners—will be the principal test of a bid.